**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Rebecca Melvan, individually and on behalf of all others similarly situated, | 1:22-cv-02114 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| General Mills Sales, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      General Mills Sales, Inc. ("Defendant") manufactures, labels, markets, and sells snack mix based on rye flour under the Gardetto's brand ("Product").



2.    The representations include "Gardetto's – Quality Since 1932" superimposed upon a hardworking Italian-American family, "Special Request," "Garlic Rye Chips," and pictures of dark brown seasoned chips.

3.    The description of the Product tells consumers its taste will be garlic and the chips will be predominantly rye flour.

## I.    CONSUMERS VALUE WHOLE GRAINS

4.    Consumers increasingly prefer whole grains to non-whole grains.

5.    Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed or kernel, consisting of the endosperm, bran, and germ.

6.    The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

7.    The bran also gives whole grains their distinctive brown coloring.

8.    Similar to how whole grain wheat flour contains the endosperm, bran, and germ, dark or whole grain rye flour contains the whole rye kernel (or grain), the endosperm, bran, and germ.

9.    Rye flour also contains less gluten than regular wheat flour.

10.    In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

11.    Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

12.    Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

13.    Where flour is made of refined grains, which only contains the endosperm and

mainly starch, it is white in color ("white flour").

14.     Whole grain rye has 24 grams of fiber per 100 grams, while non-whole wheat flour has 2.4 grams of fiber.

15.     The more of the rye kernel that remains after milling, the darker the rye flour.

## II.     CONSUMERS EXPECT FIBER FROM PRODUCTS REPRESENTED AS WHOLE GRAIN

16.     The 2015-2020 Dietary Guidelines encourage consumers to make at least half of all their grains eaten be whole grains, to promote fiber consumption.

17.     Fiber consumption is associated with positive health effects, such as digestion and weight stability.

18.     Consumer research from Mintel reveals that 87% of consumers try to consume more whole grains and 92% do so to try to get more fiber.

19.     The desire to consume more fiber is not limited to meals but to snacks.

20.     Data from SPINS shows that 55% of consumers consider fiber content a key factor when purchasing snacks.

21.     In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

22.     Almost 75% of consumers who are presented representations which contain express and implied representations that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

23.     Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

24.     62% of consumers agree that foods made from whole grains are one of the best sources of fiber.

25.    46% of consumers rely on foods with whole grains for their daily fiber needs.

26.    Based on the proven connection with fiber, consumers expect foods represented –
directly or indirectly – as whole grain, do more than tell consumers a product contains a type of
grain ingredient.

## III.    BROWN COLOR OF GRAIN PROUCTS

27.    Studies have shown that consumers seeking whole grains – and fiber – look for
products darker in color.

28.    This is logical, because whole grains contain the bran, which is dark colored.

29.    Moreover, lighter colored grain products are associated with refined grains, and
white flour.

30.    In contrast to wheat products made from non-whole grains, wheat products that
appear brown are expected to be made mainly from whole grains.

31.    Consumers use these visual shortcuts because they are consistent with their
experiences, that whole grains are darker, because they contain the brain.

32.    However, almost half of participants in a recent study incorrectly estimated the whole
grain content of grain products when relying on the color of the products.

33.    Companies have numerous methods to mislead consumers as to a product's whole
grain content, such as the addition of caramel coloring.

34.    One food and nutrition professor stated that "Even people with advanced degrees
cannot figure out how much whole grain" is in products represented to consumers as whole grain.

35.    The Food and Drug Administration ("FDA") regularly cautions companies against
misleading consumers about the whole grain content of foods, through statements, representations,
and omissions.

36.     According to the FDA, when consumers believe a product is "whole grain," such as through its appearance, they will expect all of the grains used in that product to be whole grain, or "100 percent whole grain."

37.     The Federal Trade Commission ("FTC") agreed and recognized that many reasonable consumers will likely understand whole grain representations, direct or implied, to mean that all, or virtually all, of the food product is whole grain, or that all of the grain ingredients in the product are whole grains.

38.     The FDA has warned companies against making misleading whole grain representations, even where the actions merely take advantage of common consumer assumptions, such as through product names, like "HiHo Deluxe WHOLE WHEAT Crackers" and "Krispy WHOLE WHEAT Saltine Crackers," using small amounts of dark flour and added caramel coloring to give the appearance of more whole grain.

## IV.    PRODUCT MADE WITH *DE MINIMIS* AMOUNT OF RYE FLOUR

39.     Despite the labeling of the Product as "Garlic Rye Chips," with a dark brown color, the predominant grain ingredient is "Enriched Flour," ahead of "Rye Flour" on the ingredient list.

**Ingredients: Enriched Flour** (wheat flour, niacin, iron, thiamin mononitrate, riboflavin, folic acid), **Rye Flour, Soybean Oil. Contain 2% or less of:** Salt, Sugar, Monosodium Glutamate, Yeast, Canola Oil, Caramel Color, Dried Worcestershire Sauce (vinegar, molasses, corn syrup, water, salt, caramel color, garlic powder, sugar, spices, tamarind, natural flavor), Maltodextrin, Onion Powder, Garlic Powder, Fumaric Acid, Caraway, Disodium Inosinate, Disodium Guanylate, Sodium Diacetate. Freshness Preserved by BHT.

40.     Even though enriched flour is listed ahead of rye flour, consumers who review the ingredients will not know what percent of the Product's grains are refined compared to whole

grains.

41. The *de minimis* whole grain content is confirmed by the Nutrition Facts, which reveals 1g per serving of fiber, or 4% of the Daily Value.

| Nutrition Facts | |
|---|---|
| About 13 servings per container | |
| **Serving size** | **½ cup (30g)** |
| Amount per serving | |
| **Calories** | **160** |
| | % Daily Value* |
| **Total Fat** 9g | **12%** |
| Saturated Fat 1g | **5%** |
| Trans Fat 0g | |
| **Cholesterol** 0mg | **0%** |
| **Sodium** 340mg | **15%** |
| **Total Carbohydrate** 17g | **6%** |
| Dietary Fiber 1g | **4%** |
| Total Sugars 1g | |
| Includes less than 1g Added Sugars | **2%** |
| **Protein** 3g | |
| Iron 0.9mg | 6% |
| Not a significant source of vitamin D, calcium and potassium. | |
| * The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice. | |

42. The Product contains added caramel color, which makes the mostly white flour product look dark, creating the impression it contains more rye flour than it does.

43. Chips made from predominantly or a non-*de minimis* amount of rye flour are available to consumers and are not technologically or commercially unfeasible.

## V. CONCLUSION

44. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

45. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

46.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

47.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

48.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

49.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $2.39 per 8 OZ, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

50.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

51.     The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

52.     Plaintiff Rebecca Melvan is a citizen of Illinois.

53.     Defendant General Mills Sales, Inc. is a Delaware corporation with a principal place of business in Minneapolis, Hennepin County, Minnesota.

54.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

55.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

56.     The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

57.     Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

## Parties

58.     Plaintiff Rebecca Melvan is a citizen of Oak Forest, Cook, Illinois.

59.     Defendant General Mills Sales, Inc. is a Delaware corporation with a principal place of business in Minneapolis, Minnesota, Hennepin County.

60.     Gardetto's was founded in Milwaukee, Wisconsin in 1932 by Italian immigrants Baptiste and Diane Gardetto, who sold fresh bread and breadsticks door-to-door.

61.     The Gardettos are believed to have valued rye flour because it was more nutrient-dense than standard white flour, a fact they learned during tough economic times in the Italian countryside.

62.     Perhaps with the experience of food shortages in their native Italy in mind, the Gardettos did not believe in wasting good food.

63.     They began to use the crumbs from their breadsticks and breads as the base for their line of snacks, with the flagship the "Garlic Rye Chips."

64.     The Gardetto's brand epitomized "Old World" values, which meant they never compromised on quality ingredients for their hardworking customers.

65.     According to some, Baptiste Gardetto was known to inspect the production of the rye chips to make sure consumers were getting non-*de minimis* amounts of rye flour.

66. This leadership was responsible for decades of growth, until the company was acquired by Defendant in 1999.

67. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

68. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including BP Gas Station, 5548 159th St Oak Forest, IL 60452, between April 2, 2022, and April 9, 2022, and/or among other times.

69. Plaintiff believed and expected the Product contained a non-de minimis amount of rye flour and was predominantly whole grain because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

70. Plaintiff seeks to purchase foods which contain flours other than enriched white flour, values whole grain products above non-whole grain products, and prefers rye flour to wheat flour for reasons including its nutrient content and its lower levels of gluten.

71. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

72. Plaintiff bought the Product at or exceeding the above-referenced price.

73. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

74. Plaintiff chose between Defendant's Product and products represented similarly, but

which did not misrepresent their attributes, requirements, instructions, features, and/or components.

75.     The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

76.     Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

77.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar rye-based foods, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

78.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

>   **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
>   **Consumer Fraud Multi-State Class**: All persons in the States of Iowa, Arkansas, Wyoming, North Dakota and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

79.     Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

80.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

81.     Plaintiff is an adequate representative because her interests do not conflict with other members.

82.     No individual inquiry is necessary since the focus is only on Defendant's practices

and the class is definable and ascertainable.

83.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

84.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

85.    Plaintiff seeks class-wide injunctive relief because the practices continue.

### Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq.

### (Consumer Protection Statute)

86.    Plaintiff incorporates by reference all preceding paragraphs.

87.    Plaintiff believed the Product contained a non-de minimis amount of rye flour and was predominantly whole grain.

88.    Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

89.    Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

90.    Plaintiff relied on the representations and omissions to believe the Product contained a non-de minimis amount of rye flour and was predominantly whole grain.

91.     Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

92.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are

11

similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

93.     The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

94.     Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

95.     As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

96.     Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

97.     The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it contained a non-de minimis amount of rye flour and was predominantly whole grain.

98.     Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

99.     Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

100.    Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained a non-de minimis amount of rye flour and was predominantly whole grain.

101. Defendant's representations affirmed and promised that the Product contained a non-de minimis amount of rye flour and was predominantly whole grain.

102. Defendant described the Product so Plaintiff and consumers believed it contained a non-de minimis amount of rye flour and was predominantly whole grain, which became part of the basis of the bargain that it would conform to its affirmations and promises.

103. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

104. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted family company, known for its authentic, high-quality snacks, honestly marketed to consumers.

105. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

106. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

107. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

108. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

109. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

110. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed

13

as if it contained a non-de minimis amount of rye flour and was predominantly whole grain.

111. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained a non-de minimis amount of rye flour and was predominantly whole grain, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

112. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

113. Defendant had a duty to truthfully represent the Product, which it breached.

114. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted family company, known for its authentic, high-quality snacks, honestly marketed to consumers.

115. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

116. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

117. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

118. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

119. Plaintiff and class members would not have purchased the Product or paid as much

if the true facts had been known, suffering damages.

Fraud

120. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained a non-de minimis amount of rye flour and was predominantly whole grain.

121. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

122. Defendant knew of the issues described here yet did not address them.

123. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

124. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: April 25, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com